# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | | |
|---|---|---|
| STATE OF WASHINGTON, | | No. 48740-3-II |
| Respondent, | | |
| v. | | |
| SAMUEL F. VALDEZ, | | UNPUBLISHED OPINION |
| Appellant. | | |

LEE, J. — Samuel Valdez was convicted of solicitation to commit first degree murder, first degree arson, delivery of marijuana, and possession with intent to manufacture or deliver marijuana. On appeal, Valdez argues: (1) the trial court erred in denying his motion to change venue; (2) the State did not present independent evidence of the *corpus delicti* of arson; (3) the State did not present sufficient evidence to convict him of possession with intent to manufacture or deliver marijuana; (4) the trial court erred in admitting certain evidence; (5) the prosecutor committed misconduct by (a) misstating the burden of proof; (b) professing a personal opinion on the testimony of defense witnesses; (c) impugning defense counsel; and (d) improperly alerting the jury that Valdez had been incarcerated; (6) he received ineffective assistance of counsel when his attorney failed to object to (a) the admission of Valdez's statements regarding the arson; (b) the admission of the evidence he claims was erroneously admitted; and (c) the claimed prosecutorial misconduct; (7) the cumulative effect of the errors denied him a fair trial; (8) the trial

court erred in its imposition of discretionary legal financial obligations (LFOs); and (9) this court should decline to award appellate costs to the State should this appeal fail.

We affirm Valdez's convictions, but we reverse the imposition of discretionary LFOs and remand for the superior court to make the proper inquiry under *State v. Blazina*, 182 Wn.2d 827, 838, 344 P.3d 680 (2015), before imposing discretionary LFOs.

FACTS

A.  EVENTS LEADING TO VALDEZ'S ARREST

1.  Marriage and Divorce

Valdez married Elizabeth Robbins in 2002.  Valdez filed for divorce in the fall of 2012.  A trial was held on the division of property from the marriage in 2014.  Neighbors of Valdez's and Robbins's, the Cantrells and the Bruneaus, supported Robbins in the divorce.  The dissolution trial court issued its judgment on the separation of property on July 1, 2014.

2.  Friendship with Christopher Horton

In the late summer or early fall of 2012, Christopher Horton moved into the neighborhood in Wahkiakum County where Valdez and Robbins had built a shop with an apartment attached. Valdez and Horton developed a friendship, and they spent time together almost daily.  One of the common interests Valdez and Horton shared was the cultivation and consumption of marijuana.

Valdez had a medical marijuana card and had been in the marijuana business since before he and Robbins were married.  Valdez grew an unknown number of marijuana plants and did not try to keep his marijuana activities secret.

Valdez bought a machine that converted marijuana plant material into marijuana oil. The marijuana oil was a "tarry substance" with the "[c]onsistency of honey." Verbatim Report of Proceedings (VRP) (Feb. 16, 2016) at 287. Horton helped Valdez unpack the machine in Valdez's shop. Valdez would run about 10 pounds of dried and cured marijuana through the machine every 24 hours. Ten pounds of marijuana plant material would yield one pound of marijuana oil.

Horton helped Valdez market the marijuana oil product by introducing Valdez to several people who either had licenses, or were applying for licenses, to produce and sell marijuana products. Horton also introduced Valdez to individuals who bought marijuana oil from Valdez or was interested in purchasing the marijuana oil for "the black market" and "taking it across the country." VRP (Feb. 16, 2016) at 300.

Valdez frequently discussed his divorce from Robbins with Horton. Horton testified that Valdez was "very, very upset" with Robbins and anyone who "was on [her] side," so much so that Valdez "would talk about wanting to blow holes in people's properties." VRP (Feb. 16, 2016) at 270-71. The "people's properties" that Valdez was referring to belonged to Robbins, the Cantrells, and the Bruneaus. VRP (Feb. 16, 2016) at 271.

On July 7 or 8, 2014, Valdez went to Horton's house with matchsticks, cotton, and a soda bottle, along with ground hamburger and rat poison that he said was to silence the Cantrell's dogs. On July 9, 2014, in the early morning hours, the Cantrell's house burned down.

Sometime after 7:30 that morning, Valdez drove to what remained of the Cantrell's house. Valdez asked a neighbor who was also there if anyone was killed. The neighbor told Valdez that the Cantrells were alive, but their pets had died. Valdez nodded and then drove away. The same morning, Valdez went to Horton's house and told Horton:

[t]hat he [Valdez] gave them what they deserved. He burned their house down. And that he watched the fire keep—he was all worked up and antsy about it. He was very full of adrenaline and very full of anger and satisfaction in an eerie way and was essentially bragging about it, but also very concerned about being quiet, making sure there was nobody in my house, to keep it quiet. He described to me where he was. He was up all night. He stood in his boat and watched the fire trucks go by the house. He thought that was funny.

VRP (Feb. 16, 2016) at 330.

Horton testified that Valdez told him on "numerous occasions" that "[h]e [Valdez] burned their [Cantrell's] house down," and would comment about "another barbecue in the neighborhood" and "[s]moking out the neighborhood," as code for arson. VRP (Feb. 16, 2016) at 327. An investigation did not reveal enough information to determine the cause of the Cantrell fire, and the cause was labeled "undetermined." VRP (Feb. 23, 2016) at 1089.

Also during the summer of 2014, and after the dissolution trial court issued its judgment in the divorce, Valdez took his kayak from the beach where Horton lived and paddled to the front of the Bruneaus's property. Horton accompanied Valdez. In front of the Bruneaus's property, Valdez took pictures of the property and the Bruneaus's catamaran. Valdez told Horton he "wanted to catch their catamaran on fire." VRP (Feb. 16, 2016) at 332.

During the winter months, in late 2014 or early 2015, Valdez told Horton he "was wanting to blow the Bruneaus up." VRP (Feb. 17, 2016) at 349. At the time, the area was expected to receive five or more inches of rain, and Valdez told Horton that his plan was to clog the culvert above the Bruneaus's house, so that the water would "raise above and essentially wipe out their whole property below." VRP (Feb. 17, 2016) at 350. Horton unclogged the culvert on two separate occasions after Valdez told Horton he was going to clog it.

4

3.      Investigation of Valdez by Law Enforcement

Horton reported Valdez to law enforcement in April or May of 2015. He told law enforcement that Valdez planned to kill Robbins, had burned down the Cantrell's house, and intended to burn the Bruneaus's catamaran.

Horton also reported that he told Valdez that he had an uncle in the mafia who lived in Michigan and who could be hired to kill someone. Horton testified that he told Valdez this because "if I hadn't, then he would have found somebody else and we wouldn't be here." VRP (Feb. 17, 2016) at 437-38.

Law enforcement decided to "place a wire on" Horton. VRP (Feb. 17, 2016) at 357. Horton wore a "wire" on three occasions. VRP (Feb. 17, 2016) at 363.

a. First "Wire" Recording

Horton first wore a "wire" on May 20, 2015. VRP (Feb. 17, 2016) at 364-65. The "wire" recorded:

> MR. HORTON: And I told him. He [Horton's alleged uncle] was like, "Well, how do you know he's [Valdez's] clean?" I said, "Well, you know, I witnessed him burning down the neighbors' house. I witnessed attempted murder there." You know, I said, "You know, he's not the type to just talk about shit. He actually does it. I mean, I've witnessed it with multiple neighbors and with multiple instances." And so I said, "He's solid. He's a solid guy." I mean, and that's just kind of how I told him. I mean, he's the only one I've ever talked to about that shit. But I had to f[***]ing—I had to put it out there. He laughed at me. He thought it was funny. He said, "Attempted, huh?" I said—

> THE DEFENDANT: Yeah. It's going to go—you know, it's going to go further than that. I'm either going to have to hire a f[***]ing gun or I'm going to have to f[***]ing do it myself.

MR. HORTON: To who?  These—these people?

THE DEFENDANT: These people.  The list.

MR. HORTON: The list?

THE DEFENDANT: The list.  I'm working on—I'm going to work on the f[***]ing list.  In fact, I've got—you made me laugh, because there was one time you said to me, "Sam, there's no f[***]ing morning I get up, I don't take my f[***]ing shower, I think about who the f[***]ing I'm going to kill today."  And that has been the way it has been for me for f[***]ing—two f[***]ing years.

MR. HORTON: Yeah.

THE DEFENDANT: And it's not f[***]ing going away.  And unless—that's another thing that I want—you know what?  The direction we're headed with this, yeah. I want to send a very clear message to her that I am going to haunt that f[***]ing bitch for the rest of her f[***]ing days if she doesn't sit down and we square this f[***]ing inequity in the judicial system up.  So what has haunted me for the last couple of days since we talked is how do I do that?  Do I just send little f[***]ing messages?  Do I sit down with her and say, "Hey, Beth, you know, this thing has bugged me for f[***]ing two years and it'll bug me for the rest of my f[***]ing life unless we sit down and work this f[***]ing thing out to where at least both of us walk away either equally unhappy or equally happy.  You, you know, make your choice.  But if I don't walk away from there somewhat—if we don't—if we don't work this out some way or another, believe me, there's not going to be a day that goes by that I don't think about how I'm going to get back at you."

MR. HORTON: Yeah.

THE DEFENDANT: I try to be nice about it as I can.  But she's a stupid f[***]ing bitch, you know.  I want to tell her, "Well, I've tried to send you some messages.  By the way, how's Kathy in her new house doing," you know?

MR. HORTON: Kathy?  Yeah.  Gotcha, gotcha.  Kathy, and I don't remember his name.

THE DEFENDANT: Fred.

6

MR. HORTON: That's right. Kathy and Fred [Cantrell].

THE DEFENDANT: The f[***]ing two liars in the courtroom. . . .

. . . . .

MR. HORTON: How did that f[***]ing work? You burned their f[***]ing house down and then they go and get insurance money and—

THE DEFENDANT: No. Actually, I think Beth has picked—paid a big chunk on f*** building that house.

. . . .

THE DEFENDANT: You starting to get the picture of what I got to get the message to her? How much carnage do you want to be responsible for is the message I need to f[***]ing get her.

MR. HORTON: But you're not going to go after those people again, are you? I mean, f[***], that's a—you got to leave them alone. I could—whatever.

THE DEFENDANT: You don't know me very f[***]ing—do you?

. . . .

MR. HORTON: No. It's good. I mean, you got to get it out in the open now. I mean, my uncle said that he'll be in town. . . . A flight round trip is 450 bucks. You got to pay for rental car, which is $300. And he'll be in town the beginning week of June. Prior arrangements as—as we spoke are, you know, 10,000 and $5,000 on top of that for each head.

THE DEFENDANT: Now, wait a minute. Is that—so that's $15,000 for the first head?

MR. HORTON: No. It's 15 for the two.

THE DEFENDANT: Oh, I see. First one ten and the rest are five.

VRP (Feb. 17, 2016) at 392-96, 401.[1]

---

[1] After the first recording finished playing at trial, the trial court acknowledge the presence of some reporters in the courtroom, and admonished the jury, "I assume there will be some sort of articles, as we discussed before. Please put them aside until the trial's over. If anybody wants to talk about

### b. Second "Wire" Recording

Horton wore a "wire" a second time on June 16, 2015. During this meeting, Valdez told Horton that he wanted to hold off on hiring Horton's alleged uncle to kill anyone, saying instead that he wanted to "table the matter" because "money is tight right now." VRP (Feb. 17, 2016) at 507.

### c. Third "Wire" Recording

Horton wore a "wire" a third time on June 23, 2015. VRP (Feb. 17, 2016) at 528. On this recording, Valdez stated that he would pay Horton's uncle in marijuana oil and that he would give Horton's uncle a deal on the value of the marijuana oil at $18 per gram. The following interaction was also recorded:

> MR. HORTON: Once we leave here—once we leave here, the deal's done. It's done. It's solidified. I mean, we're . . .
>
> THE DEFENDANT: It was f[***]ing done the day I said f[***]ing do it.
>
> MR. HORTON: Okay. Well, it's a done deal. So I'll follow you back to your place and grab the oil and I'll put it in the mail tomorrow for him. And then I'll go buy the plane ticket, cash.

VRP (Feb. 18, 2016) at 590. Valdez then gave Horton a container of marijuana oil. Horton testified that Valdez "handed me some cannabis oil in payment for the murder of his wife, and also pictures of her residence and pictures of her." VRP (Feb. 17, 2016) at 524. As Horton was leaving, the following exchange was recorded:

---

them, tell them you're under instructions. Make me the bad guy." VRP (Feb. 17, 2016) at 434-35.

8

THE DEFENDANT: . . . It's like—it's like buying a lottery ticket, as far as I'm concerned.

MR. HORTON: M-hm.

THE DEFENDANT: I bought my ticket, you know, and what if I really f[***]ing win?

MR. HORTON: You'll win.

THE DEFENDANT: Oh, yeah.

VRP (Feb. 18, 2016) at 616-17. Horton gave the container of marijuana oil and the pictures that Valdez had given him to law enforcement the same day.

    4.       Search Warrant Executed

Law enforcement secured and executed a search warrant on Valdez's shop and apartment. Law enforcement found 14 mason jars of marijuana oil in a refrigerator, totaling 4,828 grams; 5 mason jars of marijuana oil in a freezer, totaling 5,808 grams; a bag of marijuana in the bathroom, weighing 54.4 grams; a bag of marijuana in the shop, weighing 18 grams; a bag of marijuana on a catwalk, weighing 129.2 grams; 2 containers of marijuana oil on a table in the shop, weighing 513 grams; a box of 73 e-cigarette cartridges with approximately 1 gram of marijuana oil in each in the shop; "vape pens"; a backpack in the shop that had 77 grams of marijuana oil in cartridges; another 150 cartridges each loaded with about 1 gram of marijuana oil; syringes; and marijuana plants outside. Law enforcement testified that the vape pens were for smoking the marijuana oil contained in the cartridges and that the syringes were likely used for filling the cartridges.

B.      PRETRIAL PROCEDURE

Valdez was arrested on July 3, 2015.  Valdez was charged with solicitation to commit first degree murder, first degree arson, delivery of marijuana, and possession with intent to manufacture or deliver marijuana.

In November 2015, Valdez filed a motion for a change of venue from Wahkiakum County Superior Court.  Attached to the motion were several articles from local media sources regarding Valdez's case.  The State did not object to the venue being changed.  The trial court stated that before it decided on the motion for a change of venue, it would review the answers given on a questionnaire to the jury venire to see if it was possible to select an unbiased jury.

The jury venire was comprised of 55 potential jurors.  Each member of the venire was given a "juror questionnaire,"

> to determine if you know anything about the allegations in this case and, if so, what you know and from what source you obtained your knowledge.  Additionally, the names of potential witnesses are included in this questionnaire, to determine whether you know any of them and how you are acquainted with them.

Clerk's Papers (CP) at 402.

Five venire members did not answer whether they had heard about the case; five said they had heard about the case but were not sure or did not have an opinion about the case; eight said they had heard about the case and could not be impartial; one had fought the fire at the Cantrell's home; thirty-one had varying degrees of familiarity with the case but said they could be impartial; and one had heard about the case but did not answer the remaining questions.  Three others indicated on the questionnaire that they were unavailable on the dates that trial was scheduled.

10

After excusing some of the venire members who stated they could not be impartial or were otherwise unable to serve on the jury, the defense renewed its motion for a change of venue, citing the number of venire members who had heard of the case or knew potential witnesses. The trial court denied the motion, stating that there were still 40 members of the potential jury pool, and that while most of the potential jurors indicated they knew something of the case, the court would attempt to empanel a jury before considering a motion to change venue.

After voir dire concluded, the trial court granted four of the defense's for-cause challenges. The defense also joined in the State's single for-cause challenge, which the trial court granted. During the for-cause challenges, the defense again moved for a change of venue. The trial court denied the motion stating that it believed a fair jury could be seated based on the answers given in voir dire.

The trial court gave each side one extra peremptory challenge. The State waived its fourth, fifth, and sixth peremptory challenges. The defense waived its sixth peremptory challenge and accepted the jury. Fourteen members of the venire were selected for the jury, two of which were designated as alternates. After the jury was empaneled and sworn, the trial court instructed the jurors to not discuss the case amongst themselves or with others for the duration of the case, to "not read or listen to any newspaper or radio reports about the case," and to "keep your mind free of any influences from outside the courtroom." VRP (Feb. 16, 2016) at 203.

C.     PORTIONS OF THE TRIAL PERTINENT TO THE APPEAL

1.     Valdez's Plane Crash

Horton, when describing the anger that Valdez expressed and the concern he had for Valdez, testified about an accident where Valdez wrecked his plane. Valdez objected on relevance grounds. The objection was overruled.

2.     Pictures of the Bruneaus's Property

The State sought to introduce the pictures that Horton testified Valdez had taken of the Bruneaus's property. Valdez objected on relevance grounds. The objection was overruled. Valdez again objected on relevancy grounds when Horton was asked what he thought when Valdez said he intended to burn down the Bruneaus's catamaran. This objection was sustained and the State moved on.

3.     Clogging the Bruneaus's Culvert

When the State asked Horton if the reason Valdez planned to clog the Bruneaus's culvert was because he was upset with the Bruneaus, Valdez objected on relevance grounds and as asked-and-answered. The trial court allowed the question but directed instructed the State "to ensure that the questions are based on what he's told by the defendant, not by somebody else." VRP (Feb. 17, 2016) at 350.

4.     *Corpus Delicti* Challenge to the Arson Charge

After the State rested its case, Valdez brought a half-time motion arguing that the arson charge should be dismissed because the State failed to establish the *corpus delicti* for the crime of arson. The trial court denied the motion. In denying the motion, the trial court stated:

Here we have the fact of the fire, and at this point certainly a lack of information on how it started, but we know the fact of the fire and statements attributable to the defendant in those tapes that's certainly argued to be equivocal. But I think the common fact of the fire and those statements that can be argued to state his responsibility under that relatively recent Court of Appeals opinion are sufficient. So I'll deny the motion.

VRP (Feb. 24, 2016) at 1248.

5.      Larry Adams's Testimony

Larry Adams was married to Horton's aunt. Adams testified that Horton had "no credibility" in the community. VRP (Feb. 24, 2016) at 1357.

6.      Leon Gollersrud's Testimony

Leon Gollersrud was a neighbor and friend of Valdez. On the State's cross-examination, the following exchange took place:

Q. [by the State]: Have you visited the defendant in jail?

A. [by Gollersrud]: Not in 2016. We've communicated.

Q. Have you visited him in jail?

A. Yes. Yes. 2015.

VRP (Feb. 24, 2016) at 1286.

7.      Jury Instructions

The trial court instructed the jury, in part:

The State is the party that has the burden of proving each element of each crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists as to these elements.

The defendant is presumed innocent. This presumption continues throughout the entire trial unless during your deliberation you find it has been overcome by the evidence beyond a reasonable doubt. A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly

and carefully considering all the evidence or lack of evidence. If from such consideration you have an abiding belief, you are satisfied beyond a reasonable doubt.

VRP (Feb. 25, 2016) at 1550. The trial court also instructed the jury on how to receive the lawyers' arguments:

It is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is the testimony and the exhibits. The law is contained in my instructions to you. You must disregard any remark, statement or argument that is not supported by the evidence or the law and my instructions.

VRP (Feb. 25, 2016) at 1548; CP at 473.

8.      State's Closing Argument and Rebuttal

a. State's closing argument

During the State's closing argument, the prosecutor argued that the jury should focus on the elements of the crimes. The prosecutor then argued:

[I]f everything I just said makes sense and you have an abiding belief in the truth of that charge, that's guilty. It is not being diverted to other issues like did Chris [Horton] have a bag of weed that he said that he didn't have bags of weed? Or was Chris a bad guy? Or, you know, he told people that he could get people killed? All of that is a diversion for you, because these are so damning that you have to do something.

. . . .

      . . . And even if Chris called the police to get him [Valdez] in trouble—oh. Either Chris called the police to go and steal from his house, or I guess we're supposed to believe that when he was walking up the driveway. Whatever. It doesn't change anything. So that is just like throwing a big rock right in the middle of your (inaudible). Hey, be careful cause [sic] Chris might have had a bad motive. It doesn't matter at all. It doesn't make anything he said on the stand more [sic] believable.

VRP (Feb. 25, 2016) at 1584, 1589.

b. State's rebuttal argument

The prosecutor began her rebuttal argument by reminding the jury that the State bore the burden of proof. She argued,

> I said it at the beginning of my opening [sic] that the State has the burden of proof beyond a reasonable doubt. That's the right burden. That's as it should be. And I submit in this case that it's been made. A reasonable doubt is one for which a reason exists, not speculation, whether Chris went into a computer at his house or stole something. A reasonable doubt. Right? Not a possibility. Not a strike of lightning, but a reasonable doubt. One which—for which a reason exists, and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after what you all are going to do, fully, fairly and carefully consider all of the evidence or lack of evidence. And if from that consideration you have an abiding belief in the truth of the charge, you're satisfied beyond a reasonable doubt.

VRP (Feb. 25, 2016) at 1615.

The prosecutor then addressed Adams's testimony. She argued:

> It's shameful. It's shameful, I suggest, as an uncle to come in here, and whatever his history is with Chris—maybe Chris was—well, he thinks that he treated Chris—he said Chris didn't have a father. Well, shame on you for coming in here and doing that. Even if it's true that he's the most terrible person on earth, shame on you.

VRP (Feb. 25, 2016) at 1617-18.

The prosecutor concluded her rebuttal with:

> Well, the defendant—they didn't prove anything. They say he cropped the pictures, which is evidence. That's not evidence. He didn't—apparently you can just say you didn't do something. You can just take the stand and actually lie and say you didn't do something and never meant it anyway, and that's all it takes. That's not a reasonable doubt. None of that is a reasonable doubt. Thank you for your patience.

VRP (Feb. 25, 2016) at 1622-23.

D.    JUDGMENT AND SENTENCING

The jury found Valdez guilty on all charged counts. At Valdez's sentencing hearing, the State asked the trial court to inquire into Valdez's ability to pay LFOs. The trial court responded, "Based on the testimony already adduced, I would find the defendant has the ability to pay those costs." VRP (Mar. 14, 2016) at 1594. Valdez appeals.

ANALYSIS

A.    MOTION TO CHANGE VENUE

Valdez argues the trial court abused its discretion in denying his motion to change venue from Wahkiakum County. In support, Valdez cites the pretrial publicity, the small number of potential jurors in the county, and the large number of venire members who had heard of the case and knew the defendant or a witness. We hold that the trial court did not abuse its discretion.

We review a trial court's ruling on a motion to change venue for an abuse of discretion. *State v. Jackson*, 150 Wn.2d 251, 269, 76 P.3d 217 (2003). A trial court abuses its discretion when it makes a decision that is manifestly unreasonable or based on untenable grounds or reasons, or when it fails to exercise its discretion, such as when it fails to make a necessary decision. *State v. Stearman*, 187 Wn. App. 257, 264-65, 348 P.3d 394 (2015); *State v. Flieger*, 91 Wn. App. 236, 242, 955 P.2d 872 (1998), *review denied*, 137 Wn.2d 1003 (1999).

"Appellate courts must independently review the record to determine whether the probability of prejudice is so apparent that it constitutes error to deny the motion for a change of venue." *State v. Whitaker*, 133 Wn. App. 199, 210-11, 135 P.3d 923 (2006), *review denied*, 159 Wn.2d 1017, *cert. denied*, 552 U.S. 948 (2007). In considering the publicity a case receives, the relevant inquiry is the effect that the publicity had on the potential jurors, not whether

inflammatory publicity existed. *Jackson*, 150 Wn.2d at 269. "The best way to find out if the jurors have opinions so fixed that they cannot be impartial is to attempt to empanel a jury." *Whitaker*, 133 Wn. App. at 212; *see also Irvin v. Dowd*, 366 U.S. 717, 723, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961) ("It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."). "The fact that the 'great majority of veniremen' remember a case, without more, is 'essentially irrelevant. The relevant question is not whether the community remembered the case, but whether the jurors at [the] trial had such fixed opinions that they could not judge impartially the guilt of the defendant.'" *Jackson*, 150 Wn.2d at 269 (quoting *Patton v. Yount*, 467 U.S. 1025, 1035, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984)) (alteration in original).

In *Jackson*, a man was accused of suffocating his daughter in her bed, burying her body in a shallow grave outside of town, reporting her missing, and then moving her remains to another shallow grave when the police began investigating. *Id.* at 257-59. There was "considerable media coverage" of the girl's disappearance and the State's allegations against Jackson. *Id.* at 258. Jackson moved several times for a change of venue out of Spokane County as a result of the media coverage. *Id.* Our Supreme Court held that the trial court did not abuse its discretion in denying Jackson's motions to change venue. *Id.* at 270.

The *Jackson* court reasoned:

[A]lthough the publicity was at times extensive, and some of it inflammatory, and the great majority of the veniremen had heard of the case, the care taken by the trial court to ensure an impartial panel leads us to conclude that the Court of Appeals correctly found no abuse of discretion.

*Id*. The *Jackson* court also found it "[s]ignificant[ ]" that the defendant did "not identify any specific members of the seated jury or the alternates as being biased nor d[id] he refer to any of the questions or responses during voir dire as demonstrating these jurors' preexisting fixed opinions about the case." *Id.* at 272. Moreover, the court noted, once the jury was empaneled, the jurors were instructed to avoid media publicity or discussions about the case. *Id*.

Here, as in *Jackson*, Valdez fails to show that the publicity created "such fixed opinions that [the jurors] could not judge impartially the guilt of the defendant.'" *Id.* at 269 (quoting *Patton*, 467 U.S. at 1035). While it is true—as it was in *Jackson*—that many in the venire had heard of the case, Valdez does not identify any members of the jury who might have had a preconceived bias or any responses during voir dire that evidenced a bias.

In fact, the record does not support an inference of juror bias. First, the attempt to empanel a jury was successful. *Whitaker*, 133 Wn. App. at 212 ("The best way to find out if the jurors have opinions so fixed that they cannot be impartial is to attempt to empanel a jury"); *see also Irvin*, 366 U.S. at 723 ("It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."). Second, Valdez identified only six members of the venire whom he requested be excused for-cause after voir dire, and the trial court excused five of those for-cause. Third, Valdez did not use a peremptory challenge to excuse the remaining juror he requested be excused for-cause. Fourth, Valdez did not use all of the peremptory challenges he was given. Fifth, Valdez accepted the jury while there were still many members of the venire who had not been dismissed. Finally, the trial court instructed the jury on more than one occasion to avoid media coverage about the case and to avoid discussions about the case until

jury deliberations. Therefore, Valdez fails to show evidence of juror bias. We hold that Valdez fails to show the trial court abused its discretion in denying his motion to change venue.

B.      *CORPUS DELICTI—*ARSON

Valdez argues that the *corpus delicti* of arson was not established because the State failed to present independent evidence that the burned structure was the result of "'the willful and criminal act of some person.'" Br. of Appellant at 41 (quoting *State v. Zuercher*, 11 Wn. App. 91, 93, 521 P.2d 1184, *review denied*, 84 Wn.2d 1004 (1974)). We disagree.

1.  Legal Principles

We review a superior court's decision under the *corpus delicti* rule de novo. *State v. Green*, 182 Wn. App. 133, 143, 328 P.3d 988, *review denied*, 181 Wn.2d 1019 (2014). Under the *corpus delicti* rule:

> "The confession of a person charged with the commission of a crime is not sufficient to establish the *corpus delicti*, but if there is independent proof thereof, such confession may then be considered in connection therewith and the *corpus delicti* established by a combination of the independent proof and the confession.
>
> The independent evidence need not be of such a character as would establish the *corpus delicti* beyond a reasonable doubt, or even by a preponderance of the proof. It is sufficient if it *prima facie* establishes the *corpus delicti*."

*State v. Aten*, 130 Wn.2d 640, 656, 927 P.2d 210 (1996) (quoting *State v. Meyer*, 37 Wn.2d 759, 763-64, 226 P.2d 204 (1951)).

"The corpus delicti can be proved by either direct or circumstantial evidence." *Id.* at 655. And the evidence does not need to be sufficient to support a conviction or even enough to send the case to a jury. *Id.* at 656. But the independent evidence must be sufficient to provide prima facie corroboration of the crime allegedly committed. *State v. Brockob*, 159 Wn.2d 311, 328, 150 P.3d 59 (2006).

In evaluating the independent evidence, we assume the truth of the State's evidence and consider the logical and reasonable inferences flowing from that evidence in the light most favorable to the State. *Aten*, 130 Wn.2d at 658. Prima facie corroboration exists where the independent evidence, and its logical and reasonable inferences, support the charge sought to be proven based on the crime described in the defendant's incriminating statement. *Brockob*, 159 Wn.2d at 328.[2] The independent corroborating evidence "'must be consistent with guilt and inconsistent with a[ ] hypothesis of innocence.'" *Id.* at 329 (quoting *Aten*, 130 Wn.2d at 660) (alteration in original). Where no such evidence exists, the defendant's statement cannot be used to prove the defendant's guilt at trial. *Aten*, 130 Wn.2d at 656.

"The corpus delicti of the crime of arson consists of two elements: (1) that the building in question burned; and (2) that it burned as the result of the willful and criminal act of some person." *Zuercher*, 11 Wn. App. at 93. In *Zuercher*, the court held that "ill will and anger toward the building owner as a result of a divorce action; direct threats to burn the building in question; presence of the defendant in the general area shortly before the fire was discovered; and the fire itself" was sufficient prima facie evidence to establish the *corpus delicti* of arson. *Id.* at 94. Valdez

---

[2] As our Supreme Court in *Brockob* noted:

> [W]e are among a minority of courts that has declined to adopt a more relaxed rule used by federal courts. Under the federal rule, the State need only present independent evidence sufficient to establish that the incriminating statement is trustworthy. Under the Washington rule, however, the evidence must independently *corroborate*, or confirm, a defendant's incriminating statement.

*Brockob*, 159 Wn.2d at 328-29 (internal citations omitted).

20

does not contest that the Cantrell's home was burned; he only challenges the evidentiary support for the burning being a result of a willful and criminal act.

2. Corpus Delicti of Arson Established

Here, the evidence presented against Valdez is similar to that presented against the defendant in *Zuercher* and is similarly sufficient to establish prima facie corroboration of arson. As in *Zuercher,* the evidence established that Valdez harbored "ill will and anger toward the building owner[s]," in that Valdez was "very, very upset" with the Cantrells "as the result of a divorce action" between Robbins and Valdez, and that Valdez talked about "blow[ing] holes" in the Cantrell's property. *Id.*; VRP (Feb. 16, 2016) at 270-71. Where the evidence in *Zuercher* showed the defendant was in the area of the arson shortly before the fire was discovered, the evidence here showed that Valdez (1) went to Horton's the day before with matchsticks, cotton, and a soda bottle, as well as ground hamburger and rat poison to silence the Cantrell's dogs; (2) went to the property the morning of the fire and asked if anyone was killed; and (3) bragged to Horton about burning the house down numerous times. Therefore, just as the evidence in *Zuercher* was sufficient to establish prima facie corroboration of arson, the evidence here also was sufficient to establish the *corpus delicti* of arson.

C.    SUFFICIENCY OF THE EVIDENCE—MARIJUANA

Valdez argues that the State presented insufficient evidence to convict him of possession with intent to manufacture or deliver marijuana. Valdez's argument rests on the fact that he no longer possessed the machine he used to refine the marijuana into oil and the possession of a large quantity of marijuana is insufficient to establish his intent to deliver. We hold that Valdez's challenge fails.

Sufficient evidence supports a conviction if any rational trier of fact, when viewing the evidence in the light most favorable to the State, could have found the essential elements of the charged crime proved beyond a reasonable doubt. *State v. Owens*, 180 Wn.2d 90, 99, 323 P.3d 1030 (2014). A claim of insufficiency admits the truth of the State's evidence. *State v. Brown*, 162 Wn.2d 422, 428, 173 P.3d 245 (2007). This court reviews challenges to the sufficiency of the evidence by drawing all reasonable inferences in favor of the State and interpreting those inferences strongly against the defendant. *Id.*

"The intent to deliver must logically follow as a matter of probability from the evidence." *State v. Campos*, 100 Wn. App. 218, 222, 998 P.2d 893, *review denied*, 142 Wn.2d 1006 (2000). This means that possession of a controlled substance, alone, is insufficient to infer the intent to deliver. *Id.* Additionally, if the intent to deliver is to be inferred from the possession of a large quantity of the controlled substance, a police officer's opinion that the amount is more than normal for personal use is insufficient, and some additional factor must be present. *Id.* Those additional factors can be scales, baggies or packaging material, and pieces of paper with potential customer information. *Id.* at 223.

Here the evidence showed that a large quantity of marijuana and marijuana products was discovered during the execution of the search warrant. The evidence also showed that packaging materials such as mason jars, bags, vape pens, e-cigarette cartridges, and syringes were found. Furthermore, the evidence showed that Valdez intended to pay Horton's uncle with marijuana oil. Finally, Valdez conceded that he had previously delivered marijuana products to others, and Valdez was recorded negotiating deliveries of marijuana products to Horton.

Viewing this evidence in the light most favorable to the State and drawing reasonable inferences in the State's favor, a rational trier of fact could have found Valdez possessed the marijuana and marijuana products with intent to distribute. Therefore, we hold that Valdez's challenge to the sufficiency of the evidence to convict him of possession with intent to manufacture or deliver marijuana fails.

D.    EVIDENTIARY ADMISSIONS

Valdez argues that the trial court abused its discretion in admitting evidence of Valdez wrecking his plane, intending to burn the Bruneaus's catamaran, and clogging the Bruneaus's culvert. Valdez argues that these were instances of prior bad acts and the trial court should have excluded them under ER 404(b).[3] We hold that Valdez did not preserve this argument for appeal.

Generally, a party who objects to evidence on one ground may not raise a different ground for that objection on appeal. *State v. Mason*, 160 Wn.2d 910, 933, 162 P.3d 396 (2007), *cert. denied*, 553 U.S. 1035 (2008). An objection at trial based on "relevance" is insufficient to preserve for appeal an assignment of error under ER 404(b). *Id.* at 933.

Here, Valdez objected to the testimony regarding the wrecking of his plane, the intent to burn the catamaran, and the desire to clog the culvert on relevance grounds only. Therefore, we hold that Valdez did not preserve this argument for appeal.[4]

---

[3] ER 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, this evidence may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b).

[4] Valdez also contends that it was error to admit testimony about his truck being wrecked. Valdez's brief fails to cite any portion of testimony that addresses the truck being wrecked. Thus, this argument is not addressed. RAP 10.3(b); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Even if citations were provided, a review of the record shows that

E.     PROSECUTORIAL MISCONDUCT

Valdez argues that the prosecutor committed misconduct. Specifically, Valdez argues that the prosecutor (1) misstated the burden of proof; (2) professed a personal opinion on the testimony of defense witnesses; (3) impugned defense counsel; and (4) improperly alerted the jury that Valdez had been incarcerated. We hold that Valdez failed to preserve these arguments for appeal.

1.     Legal Principles

To prevail on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). First, we determine whether the prosecutor's conduct was improper. *Id.* at 759. If the prosecutor's conduct was improper, the question turns to whether the prosecutor's improper conduct resulted in prejudice. *Id.* at 760–61. Prejudice is established by showing a substantial likelihood that the prosecutor's misconduct affected the verdict. *Id.* at 760.

However, if a defendant does not object at trial, he or she is deemed to have waived any error unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured any resulting prejudice. *Id.* at 760–61. Under this heightened standard of review, the defendant must show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). In making a prejudice determination, this court "focus[es] less on

---

Valdez never objected to the evidence of the truck as inadmissible under ER 404(b). Therefore, as with the other evidentiary challenges Valdez makes, the challenge was not preserved for appeal. RAP 2.5(a).

whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *Id.* at 762.

Prosecutors are afforded wide latitude to draw and express reasonable inferences from the evidence in closing argument. *State v. Reed*, 168 Wn. App. 553, 577, 278 P.3d 203, *review denied*, 176 Wn.2d 1009 (2012). Prosecutors may not rely on facts outside the evidence or use arguments calculated to inflame the passions or prejudices of the jury. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 705, 286 P.3d 673 (2012); *State v. Jones*, 71 Wn. App. 798, 808, 863 P.2d 85 (1993), *review denied*, 124 Wn.2d 1018 (1994). We do not look at the comment in isolation but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury. *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007), *cert. denied*, 554 U.S. 922 (2008). And we presume the jury follows the trial court's instructions. *State v. Southerland*, 109 Wn.2d 389, 391, 745 P.2d 33 (1987); *State v. Anderson*, 153 Wn. App. 417, 428, 220 P.3d 1273 (2009), *review denied*, 170 Wn.2d 1002 (2010).

2.      Misstating the Burden of Proof and Reasonable Doubt

Valdez argues the prosecutor misstated its burden of proof and reasonable doubt when the prosecutor argued that beyond a reasonable doubt was not akin to "a strike of lightning," and when the prosecutor said Valdez "didn't prove anything" and Valdez's "lie" on the stand did not create a reasonable doubt. Br. of Appellant at 50-51; VRP (Feb. 25, 2016) at 1622-23. Valdez did not object to the prosecutor's statements at trial. On appeal, Valdez fails to show how a curative instruction to the claimed errors would not have obviated any resulting prejudice. Valdez contends that the statements were flagrant and ill-intentioned, and that he was likely prejudiced by the statements, without further argument or citation to authority for the assertions. Therefore, we hold

Valdez waived the arguments for appeal. "'Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none. '" *State v. Dow*, 162 Wn. App. 324, 331, 253 P.3d 476 (2011) (quoting *State v. Logan*, 102 Wn. App. 907, 911 n.1, 10 P.3d 504 (2000)).

3.    Professing a Personal Opinion

Valdez also argues that the prosecutor's statement "You can just take the stand and actually lie and say you didn't do something and never meant it anyway, and that's all it takes. That's not reasonable doubt," and the prosecutor's characterization of the testimony of Horton's uncle, Adams, as "shameful," were improper personal opinions. VRP (Feb. 25, 2016) at 1623. Valdez did not object to the prosecutor's statements at trial. On appeal, Valdez fails to show how a curative instruction to either claimed error would not have obviated any resulting prejudice. Valdez contends that the statements were improper and "particularly prejudicial," without further argument or citation to authority for the assertions. Br. of Appellant at 52. Therefore, we hold Valdez waived the error for appeal. *Emery*, 174 Wn.2d at 760–61; *Dow*, 162 Wn. App. at 331.

4.    Impugning Defense Counsel

Valdez argues that the prosecutor impugned defense counsel when she made the following statements: (1) "All of that [the negative aspects of Horton's character] is a diversion for you [the jury], because these [recordings] are so damning that you have to do something"; (2) "So that [whether Horton's motives for turning Valdez in to the police were pure] is just "like throwing a big rock right into the middle of your (inaudible)"; and (3) "Not a possibility. Not a strike of lightning, but a reasonable doubt." VRP (Feb. 25, 2016) at 1584, 1589, 1615; Br. of Appellant at 53. Valdez did not object to any of the prosecutor's statements at trial. On appeal, Valdez fails to

26

show how a curative instruction to the claimed errors would not have obviated any resulting prejudice. Valdez contends that the statements "were improper and highly prejudicial, given the facts in this case" without further argument or citation to authority for the assertions. Br. of Appellant at 54. Therefore, we hold Valdez waived any error for appeal. *Emery*, 174 Wn.2d at 760–61; *Dow*, 162 Wn. App. at 331.

5.      Disclosure of Valdez's Prior Incarceration

Valdez argues that the prosecutor committed misconduct by eliciting from Gollersrud that Valdez had been incarcerated. Valdez did not object. On appeal, Valdez fails to show how a curative instruction to the claimed error would not have obviated any resulting prejudice. Therefore, we hold Valdez waived any error for appeal. *Emery*, 174 Wn.2d at 760–61; *Dow*, 162 Wn. App. at 331.

F.      INEFFECTIVE ASSISTANCE OF COUNSEL

Valdez argues he received ineffective assistance of counsel when his attorney failed to object to (1) the admission of Valdez's statements regarding the arson of the Cantrell's home; (2) the admission of the evidence he claims should have been excluded under ER 404(b); and (3) the claimed prosecutorial misconduct. We hold that Valdez's arguments fail.

1.      Legal Principles

Criminal defendants are afforded the right to effective assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. *Strickland v. Washington*, 466 U.S. 668, 685–86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). To establish ineffective assistance of counsel, Valdez must show both deficient performance and resulting prejudice. *State*

*v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Deficient performance occurs when counsel's performance falls below an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998). To show prejudice, Valdez must demonstrate that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *McFarland*, 127 Wn.2d at 337. If Valdez fails to satisfy either prong, we need not inquire further. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

There is a strong presumption of effective assistance, and Valdez bears the burden of demonstrating the absence of a legitimate strategic or tactical reason for the challenged conduct. *McFarland*, 127 Wn.2d at 336. Decisions on whether and when to object are "classic example[s] of trial tactics." *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662, *review denied*, 113 Wn.2d 1002 (1989). "Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." *Id.*; *see also State v. Johnston*, 143 Wn. App. 1, 19, 177 P.3d 1127 (2007) (quoting the same). It is a legitimate trial tactic to forego an objection in circumstances where counsel wishes to avoid highlighting certain evidence. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004). Where a defendant bases his ineffective assistance of counsel claim on trial counsel's failure to object, the defendant must show that the objection would likely have succeeded. *State v. Gerdts*, 136 Wn. App. 720, 727, 150 P.3d 627 (2007).

2.    Statements Regarding the Arson of the Cantrell's Home

Valdez argues he received ineffective assistance of counsel when his attorney did not object to admitting his statements regarding the arson prior to trial, but rather waited to move to dismiss

on *corpus delicti* grounds after the State rested. Valdez argues this was prejudicial because the jury heard his statements "and could consider them when deliberating on the other counts." Br. of Appellant at 56.

As explained above, the admission of Valdez's confession was proper because the *corpus delicti* was established. Because the *corpus delicti* was established, an earlier objection on *corpus delicti* grounds would not have succeeded. Valdez's ineffective assistance argument for failure to object earlier necessarily fails. *Gerdts*, 136 Wn. App. at 727; *Hendrickson*, 129 Wn.2d at 78.

3.     Alleged ER 404(b) Evidence

Valdez argues he received ineffective assistance of counsel when his attorney did not object to admitting evidence of "the plane crash, car crash, allegations about wanting to burn the Bruneaus's catamaran, and clog a culvert" under ER 404(b). Br. of Appellant at 56. Valdez does not argue that an objection to this evidence under ER 404(b) would have likely succeeded.[5] Failure to do so is fatal to Valdez's claim that his attorney provided ineffective assistance. *Gerdts*, 136 Wn. App. at 727. Therefore, we reject Valdez's claim that failure to object under ER 404(b) constituted ineffective assistance of counsel.

4.     Alleged Prosecutorial Misconduct

Valdez argues he received ineffective assistance of counsel when his attorney did not object to the prosecutor's misconduct. Valdez contends that defense counsel should have objected when

---

[5] Even if Valdez had argued that an objection would likely have succeeded, and we agreed with his argument, Valdez does not argue that but-for counsel's failure to object, the result of the proceeding would have been different. *McFarland*, 127 Wn.2d at 335. Failure to make this argument is fatal to Valdez's claim for reversal under ineffective assistance of counsel. *Hendrickson*, 129 Wn.2d at 78.

the prosecutor (1) misstated the burden of proof; (2) professed a personal opinion on the testimony of defense witnesses; (3) impugned defense counsel; and (4) improperly alerted the jury that Valdez had been incarcerated.  We hold that Valdez's arguments fail.

a. Misstating the Burden of Proof

Valdez argues that his counsel provided ineffective assistance by failing to object when the prosecutor misstated its burden of proof by arguing beyond a reasonable doubt was not akin to "a strike of lightning" and when the prosecutor said Valdez "didn't prove anything" and Valdez's "lie" on the stand did not create a reasonable doubt.  Br. of Appellant at 50-51; VRP (Feb. 25, 2016) at 1622-23.  We disagree.

i. "Strike of lightning"

Valdez argues that the "strike of lightning" example was improper because the State argued that reasonable doubt is not speculation and the State "improperly conflates a strike of light[ning] with the real possibility that Mr. Horton . . . was able to get a photo off of Mr. Valdez's computer to frame him."  Br. of Appellant at 50.  Valdez asserts that "[i]f a jury finds that it was possible that Mr. Horton might have obtained the photo from Mr. Valdez's computer, that would create a reasonable doubt."  Br. of Appellant at 50-51.

Valdez's argument fails because it relies on the incorrect assumption that the State had to prove how Horton came into possession of the photo.  This assumption is incorrect because the State's burden was "to prove 'beyond a reasonable doubt . . . every fact necessary to constitute the crime with which [a defendant] is charged.'"  *State v. W.R.*, 181 Wn.2d 757, 762, 336 P.3d 1134 (2014) (alteration in original) (quoting *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)).  And how Horton came into possession of the photo is not a fact necessary to

constitute the crime of solicitation to commit murder. Therefore, Valdez's argument that the "strike of lightning" statement was improper fails, and Valdez fails to establish that an objection to that statement would have been successful. VRP (Feb. 25, 2016) at 1615; *Gerdts*, 136 Wn. App. at 727.

#### ii. "Didn't prove anything" and "take the stand and actually lie"

Valdez argues that the prosecutor's statement that "the defendant—they didn't prove anything. . . . [A]pparently you can just say you didn't do something. You can just take the stand and actually lie and say you didn't do something and never meant it anyway, and that's all it takes. That's not reasonable doubt," was improper because it misstated the burden of proof. VRP (Feb. 25, 2016) at 1622-23. We agree that this argument was improper because it incorrectly implied that the defendant had a burden to prove something. *See W.R.*, 181 Wn.2d at 762 (holding that the State has the burden to prove every element of the charged crime). Thus, an objection to this statement would have succeeded. *Gerdts*, 136 Wn. App. at 727.

Despite this, Valdez fails to establish prejudice from his attorney's failure to object. "A jury is presumed to follow the instructions of the court." *Southerland*, 109 Wn.2d at 391. The jury was properly instructed on the State's burden of proof, and was instructed that the attorney's arguments were not the law and that the jury should disregard any remark or statement by the attorneys that was contrary to the instructions given by the court.

Moreover, Valdez cannot show there was a reasonable probability that the result of the proceeding would have been different because the evidence against Valdez was overwhelming. At trial, the State presented evidence of the conversations recorded on Horton's wire where Valdez agreed to pay for Horton's alleged uncle to kill Robbins, talked about burning down the Cantrell's

house and Bruneaus's catamaran, discussed his possession marijuana, and discussed manufacturing the marijuana oil and his delivery of that marijuana oil. The State further presented testimony that Valdez was angry at Robbins, the Cantrells, and the Bruneaus, decided to have Robbins killed, showed preparation to burn down the Cantrell's house, bragged about burning down the Cantrell's house, showed up at the Cantrell's a few hours after it burned down asking if anyone had died, articulated plans to burn down the Bruneaus's catamaran, and made and sold marijuana oil. On this record, we hold that Valdez's assertions of ineffective assistance of counsel for failing to object to the prosecutor's misstating the burden of proof fail because Valdez cannot establish prejudice. *McFarland*, 127 Wn.2d at 335; *Hendrickson*, 129 Wn.2d at 78.

b. Professing a Personal Opinion

Valdez argues that his counsel provided ineffective assistance by failing to object when the prosecutor improperly argued based on her personal opinion. Specifically, Valdez argues the prosecutor's statement, "You can[ ] just take the stand and actually lie and say you didn't do something and never meant it anyway, and that's all it takes. That's not reasonable doubt," and the prosecutor's characterization of the testimony of Horton's uncle, Adams, as "shameful," were improper personal opinions. Br. of Appellant at 52-53. We disagree.

The Rules of Professional Conduct prohibit lawyers from "stat[ing a] personal opinion as to the justness of a cause, the credibility of a witness, . . . or the guilt or innocence of an accused." RPC 3.4(e). Similarly, our Supreme Court has stated that the prosecution may not assert its personal opinion as to a witness's credibility. *State v. Reed*, 102 Wn.2d 140, 145, 684 P.2d 699 (1984); *State v. Lindsay*, 180 Wn.2d 423, 438, 326 P.3d 125 (2014).

Here, the prosecutor improperly asserted her personal opinion on the justness and credibility of Adams and Valdez by stating that Adams's testimony was "shameful" and Valdez had "lie[d]." VRP (Feb. 25, 2016) at 1617, 1623. However, Valdez fails to provide any argument that but-for counsel's failure to object, the result of the proceeding would have been different, and Valdez's failure to make that argument is fatal to his claim for reversal under ineffective assistance of counsel. *McFarland*, 127 Wn.2d at 335; *Hendrickson*, 129 Wn.2d at 78. As discussed above, the evidence against Valdez was overwhelming. We hold that Valdez's challenge fails.

### c. Impugning Defense Counsel

Valdez argues that his counsel provided ineffective assistance by failing to object when the prosecutor impugned defense counsel. Valdez argues that the prosecutor impugned defense counsel by "implying that the defense was trying to trick the jury, divert their attention, and raise impossible defenses because the evidence was so harmful." Br. of Appellant at 54. In support, Valdez likens these comments to the prosecutors' comments in *Thorgerson*, 172 Wn.2d at 451, and *Lindsay*, 180 Wn.2d at 433. We disagree.

During closing argument in *Thorgerson*, the prosecutor "accused the defense of engaging in 'sl[e]ight of hand' tactics and used disparaging terms like 'bogus' and 'desperation' to describe the defense." 172 Wn.2d at 450 (quoting the record). The court held that the prosecutor's reference to the defense's case "as 'bogus' and involving 'sleight of hand'" was improper because it impugned defense counsel's integrity and "implie[d] wrongful deception or even dishonesty in the context of a court proceeding." *Id.* at 451-52. "Nonetheless," the *Thorgerson* court held that "this misconduct was not likely to have altered the outcome" and "a curative instruction would have alleviated any prejudicial effect." *Id.* at 452.

In *Lindsay*, the prosecutor referenced the defenses closing argument by saying, "'This is a crock. What you've been pitched for the last four hours is a crock.'" 180 Wn.2d at 433 (quoting the record). The court held that the prosecutor impugned defense counsel by calling the closing arguments a "crock," reasoning that the term was short for an explicitly vulgar phrase, was at least as bad as "bogus" and "sleight of hand," and implied deception and dishonesty. *Id.*

Here, the statements by the prosecutor did not rise to the level of impropriety that the court confronted in *Thorgerson* and *Lindsay* because the statements did not imply that defense counsel was deceptive or dishonest nor did they otherwise comment on defense counsel's integrity. The prosecutor argument that the defense's focus on the negative aspects of Horton's character "is a diversion" from the issues in the case was a fair argument that the jury should "not be[ ] diverted to other issues like did Chris [Horton] have a bag of weed . . . . Or was Chris a bad guy? Or, you know, he told people that he could get people killed?" VRP (Feb. 25, 2016) at 1584. And the prosecutor's comment, "Not a possibility. Not a strike of lightning, but a reasonable doubt," was not addressing the defense's character or integrity. VRP (Feb. 25, 2016) at 1615. Rather, the prosecutor's statements directed the jury to focus on whether it had proven that Valdez committed the charged crimes. Therefore, we hold that the prosecutor's statements did not impugn defense counsel, and Valdez fails to establish that an objection to that statement would have been successful. *Gerdts*, 136 Wn. App. at 727.[6]

---

[6] Additionally, Valdez does not argue that but-for counsel's failure to object, the result of the proceeding would have been different, and Valdez's failure to make that argument is fatal to his claim for reversal under ineffective assistance of counsel. *McFarland*, 127 Wn.2d at 335; *Hendrickson*, 129 Wn.2d at 78.

d. Disclosure of Valdez's Prior Incarceration

Valdez argues that his counsel provided ineffective assistance by failing to object when the prosecutor questioned Gollersrud about seeing Valdez in jail. We disagree.

Valdez does not cite any law for the proposition that the prosecutor's question referencing Valdez's incarceration was improper. Instead, Valdez cites cases holding that appearing in shackles and showing booking photos to be reversible error. However, Valdez does not explain how those cases apply to a reference to incarceration during cross-examination. *Dow*, 162 Wn. App. at 331. As such, Valdez fails to show that the prosecutor committed misconduct warranting an objection when she asked a question of Gollersrud about visiting Valdez in jail. Accordingly, Valdez fails to show his objection would have been successful. *Gerdts*, 136 Wn. App. at 727.[7]

G.     CUMULATIVE ERROR

Valdez argues that the cumulative effect of the errors that occurred during his trial prevented him from receiving a fair trial. We disagree.

"Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *Emery*, 174 Wn.2d at 766. In *Emery*, the court held that the prosecutor committed misconduct by impermissibly implying that the defense had a burden to prove some aspect of the case and by mischaracterizing the role of the jury. *Id.* at 759-60. But the court held that the prosecutorial misconduct did not warrant reversal because the defendants had not shown the requisite prejudice. *Id.* at 760-64.

---

[7] Valdez does not argue that but-for counsel's failure to object, the result of the proceeding would have been different. Valdez's failure to make that argument is fatal to his claim for reversal under ineffective assistance of counsel. *McFarland*, 127 Wn.2d at 335; *Hendrickson*, 129 Wn.2d at 78.

The *Emery* court also held that the cumulative effect of the errors at trial did not warrant a new trial. *Id.* at 766. The court reasoned that the defense was only affected by the prosecutorial misconduct error, and it failed to demonstrate the requisite prejudice for that error to be reversed. *Id*.

Similarly, here, the prosecutor committed misconduct by misstating the burden of proof and improperly asserting her personal opinion, but Valdez fails to show the requisite prejudice to warrant reversal. Valdez also cannot show there was a reasonable probability that the result of the proceeding would have been different because the evidence against Valdez was overwhelming. Therefore, we hold that Valdez has not shown that the cumulative effect of the errors at his trial require reversal.

H.    LEGAL FINANCIAL OBLIGATIONS

Valdez argues the trial court erred when it imposed discretionary LFOs without considering his "indigency and lenthgy [sic] incarceration into consideration, and relied on assets Mr. Valdez previously had, without considering his outstanding debts and legal fees." Br. of Appellant at 62. Despite Valdez's failure to preserve this issue for appeal, we address the merits of the argument.[8]

We review a decision to impose discretionary LFOs for abuse of discretion. *State v. Clark*, 191 Wn. App. 369, 372, 362 P.3d 309 (2015). A decision is an abuse of discretion when it is exercised on untenable grounds or for untenable reasons. *Id*.

---

[8] Valdez did not object to the imposition of LFO's at sentencing. The *Blazina* court affirmed that a defendant must object to LFOs below to preserve the issue for appellate review, but indicated that review of unpreserved challenges will often be appropriate due to systemic problems related to the imposition of LFOs. *Blazina*, 182 Wn.2d at 834-35. In light of *Blazina*, as well as our Supreme Court's decision to review unpreserved challenges to LFOs, in *State v. Lyle*, 184 Wn.2d 1040, 365 P.3d 1263 (2016), and *State v. Marks*, 185 Wn.2d 143, 368 P.3d 485 (2016), we exercise its discretion under RAP 2.5(a) and review Valdez's challenge to the LFOs imposed.

Before imposing discretionary LFOs, the trial court must make an individualized inquiry into the defendant's present and future ability to pay. RCW 10.01.160(3); *Blazina*, 182 Wn.2d at 838. The trial court's inquiry should consider factors such as incarceration and the defendant's other debts, including restitution. *Id.*

Here, the record does not reflect that the trial court made an individualized inquiry into Valdez's present and future ability to pay LFOs. The entirety of the trial court's inquiry was a one-sentence finding that did not appear to consider Valdez's incarceration and other debts, as *Blazina* suggests the inquiry should consider. The trial court ruled, "Based on the testimony already adduced, I would find the defendant has the ability to pay those costs." VRP (Mar. 14, 2016) at 1594. There is nothing in the record showing what "testimony already adduced" the trial court relied on. VRP (Mar. 14, 2016) at 1594. Therefore, the record does not sufficiently reflect the basis for the trial court's decision. *Blazina*, 182 Wn.2d at 838. Accordingly, we reverse the imposition of discretionary LFOs and remand for the superior court to consider Valdez's present and future ability to pay LFOs in light of *Blazina*.

I.    APPELLATE COSTS

Valdez requests that we decline to impose appellate costs against him if the State prevails on this appeal and makes a proper request. We refer to a commissioner of this court the determination of appellate costs under RAP 14.2 if the State files a cost bill and Valdez objects.

No. 48740-3-II

We affirm Valdez's convictions, but we reverse the imposition of discretionary LFOs and remand for the superior court to make the proper inquiry under *State v. Blazina*, 182 Wn.2d at 838, before imposing discretionary LFOs.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, A.C.J.

Sutton, J.

38